18 A.3d 110

The **UNITED STATES LIFE INSURANCE COMPANY IN the CITY OF NEW YORK, et al.**

v.

**Elizabeth WILSON.**

No. 2544, Sept. Term, 2009.

Court of Special Appeals of Maryland.

April 28, 2011.

**454**

Adrienne C. Publicover, San Francisco, CA (Cynthia Maskol, Angela W. Russell, Wilson Elser, Moskowitz, Edelman & Dicker, LLP, on the brief) Baltimore, MD, for appellant.

Paul D. Berkman (Katharine O. Porwick, Salsbury, Clements, Bekman, Marder & Adkins, LLC, on the brief) Baltimore, MD, for appellee.

Panel: EYLER, DEBORAH S., KEHOE, and J. FREDERICK SHARER, (Retired, Specially Assigned), JJ.

DEBORAH S. EYLER, J.

The principal issue in this case is whether a policy of insurance on the life of John G. Griffith, M.D., was in force the day he died. We hold that it was.

In the Circuit Court for Baltimore City, Elizabeth Wilson, Dr. Griffith's widow and the appellee, filed a breach of contract action against the United States Life Insurance Company in the City of New York ("US Life") and AMA Insurance Agency, Inc. ("AMAIA"), the appellants, claiming they had failed to pay the death benefit and accidental death benefit on a policy insuring Dr. Griffith's life ("the Policy"). The appellants maintained that the Policy no longer was in force when Dr. Griffith died. Ms. Wilson acknowledged that the Policy had lapsed but maintained that it had been reinstated before

Dr. Griffith died. The court agreed with Ms. Wilson and granted summary judgment in her favor.

In this appeal, the appellants present two questions for review, which we have rephrased:

I. Did the circuit court err in ruling on the summary judgment record that the Policy was in force when Dr. Griffith died?

II. Did the circuit court err in ruling on the summary judgment record that AMAIA was jointly and severally liable with U.S. Life for payment under the Policy?

We conclude that the circuit court correctly ruled that the Policy was in force when Dr. Griffith died. It erred, however, in ruling that AMAIA had any contractual obligation to pay benefits under the Policy. Accordingly, we shall affirm the judgment against U.S. Life and reverse the judgment against AMAIA. In addition, we shall remand the case to the circuit court with instructions to enter judgment in favor of AMAIA.

## FACTS AND PROCEEDINGS

Effective November 15, 1998, Dr. Griffith purchased an "American Medical Association–Sponsored Group Level Term Life Insurance Policy," Certificate Number 9500108167, which was underwritten by U.S. Life. The Policy was for a 10–year term. Dr. Griffith was the owner of the Policy and was the named insured. Ms. Wilson was the primary beneficiary. Under the Policy, if Dr. Griffith died "while this [life] insurance is in force," then, upon presentation of proof of his death to U.S. Life, U.S. Life would pay the beneficiary the scheduled benefit. The scheduled benefit for death was $400,000, with an additional accidental death benefit of $250,000.

Dr. Griffith purchased the Policy through AMAIA, a subsidiary of the American Medical Association. AMAIA's office is located in Chicago, Illinois. AMAIA acted as the third-party administrator for U.S. Life, meaning that, with respect to U.S. Life policies, including this Policy, it was responsible for, among other things, billing and collecting premiums. AMAIA was authorized to receive premium payments on the Policy.

The Policy contained the following **"PREMIUM PAY-MENTS"** provision:

Premiums will be due annually, or at another agreed upon frequency, as long as you remain eligible for insurance.

Payment can be made to United States Life at United States Life's Home Office or to our authorized agent. Payment of any premium will not maintain insurance in force past the next premium due date, except as provided in the Grace Period provision.

As permitted by AMAIA, Dr. Griffith elected to make semi-annual premium payments for the Policy, due on or before May 15 and November 15 of each year. The premiums were billed by AMAIA and the premium payments were made to it, at its office in Chicago.

The Policy **"GRACE PERIOD"** provision, as referenced in the **"PREMIUM PAYMENTS"** clause, read as follows:

Each premium, after the first, may be paid up to 31 days after its due date. This period is the grace period. The insurance provided by the group policy will stay in effect during this period. If the premium is not paid by the end of this period, such insurance will end at that time.

United States Life may extend the grace period by written notice. Such notice will state the date insurance will end if the premium remains unpaid.

Premiums must be paid for a grace period and any extension of such period.

The Policy further contained a **"REINSTATEMENT"** clause detailing how coverage could be reinstated after a lapse:

If the coverage ceases as provided in the Grace Period provision, you may reinstate it. Reinstatement must be made within 90 days after the due date of the first unpaid premium.

Such reinstatement is subject to:

1. Payment of all overdue premiums; and

2. Written approval by United States Life of the required evidence of insurability. However, such evidence will not be required within 31 days after the end of the Grace Period.[1]

Dr. Griffith made his semi-annual premium payments from 1998 through 2006. Before his May 15, 2007 premium came due, AMAIA sent him an undated "**BILL NOTICE**" reminding him of the upcoming payment due date. During that period of time, Dr. Griffith was obtaining quotes from other life insurance companies for similar coverage, with the apparent purpose of changing insurers. Dr. Griffith failed to pay the May 15, 2007 Policy premium. After he missed the payment, AMAIA sent him an undated "**REMINDER NO-TICE**," stating: "To assure active coverage, full payment of the premium must be received no later than 60 days from the due date." The due date was again listed as May 15, 2007.

On a date that is not disclosed by the record, but probably was not long after June 15, 2007, AMAIA sent Dr. Griffith an undated "**LAPSE NOTICE**." It stated:

This coverage remained in effect during the 31 day Grace Period. Since the premium was not paid by the end of the grace period, your coverage has now lapsed.

If you wish to reinstate simply complete and sign the enclosed Reinstatement Form and mail it along with the remittance portion of this notice. A pre-addressed envelope is enclosed for your convenience. Please note that your forms must be received within the next 30 days.

The form accompanying the "**LAPSE NOTICE**" was entitled "**APPLICATION FOR REINSTATEMENT OF COVER-AGE**," and subtitled, "STATEMENT OF GOOD HEALTH AND INSURABILITY."

Until Monday, July 23, 2007, Dr. Griffith still had not taken any steps to pay the overdue May 15, 2007 premium. That day, he accessed by computer his on-line bank account with

---

1. "Grace" and "Period" are capitalized in the "**PREMIUM PAY-MENTS**" and "**REINSTATEMENT**" clauses, but not in the "**GRACE PERIOD**" clause.

Bank of America and electronically directed that a premium payment of $369.46 be made to AMAIA. Bank of America documents in the summary judgment record show that a check for that amount "was sent to AMA Insurance Agency on [Wednesday] 07/25/07 and delivered on [Monday] 07/30/07." The check, bearing Dr. Griffith's "Authorized Signature," which appears to have been created electronically, was drawn on JP Morgan Chase Bank, N.A., and was dated July 30, 2007. Dr. Griffith did not send U.S. Life the "**APPLICATION FOR REINSTATEMENT OF COVERAGE**" or any other evidence of insurability.

On Saturday, July 28, 2007, Dr. Griffith, Ms. Wilson, and their children were on vacation in Bethany Beach, Delaware. Dr. Griffith went on an early morning bike ride. He was kneeling beside his bicycle on the shoulder of State Route 1 at 7:40 a.m. when he was struck and killed by a car that drifted off the road when its driver fell asleep at the wheel. Dr. Griffith was 44 years old when he died.

As noted above, AMAIA received Dr. Griffith's premium check on July 30, 2007. On August 2, 2007, AMAIA rejected the payment and returned the check enclosed in a letter advising that, because Dr. Griffith's "payment was received after the closing of the 30–day grace period," he no longer could renew his insurance coverage simply by making the premium payment. Instead, he could apply for reinstatement of coverage by completing and returning an "**APPLICATION FOR REINSTATEMENT OF COVERAGE**," although approval was not guaranteed. When the August 2, 2007 letter was sent, AMAIA had no information that Dr. Griffith had died.

On September 28, 2007, Ms. Wilson, through counsel, submitted a claim to AMAIA for the death benefit and accidental death benefit under the Policy. AMAIA denied her claim by letter of April 14, 2008, stating that the Policy had lapsed on May 15, 2007, and therefore was not in force when Dr. Griffith died.

On May 30, 2008, in the Circuit Court for Baltimore County, Ms. Wilson filed suit against U.S. Life and AMAIA for breach of contract. Pursuant to the court's scheduling order, a period for discovery was followed by a June 29, 2009 deadline for filing motions for summary judgment.

On June 26, 2009, U.S. Life and AMAIA jointly filed a motion for summary judgment; and then, on June 30, 2009, they filed a second, substitute motion for summary judgment, advancing slightly different arguments than they had originally. In the meantime, on June 29, 2009, Ms. Wilson filed her own motion for summary judgment. The parties requested a hearing and filed oppositions to their opponents' motions.

The cross-motions for summary judgment came on for a hearing on August 7, 2009. The court denied U.S. Life and AMAIA's summary judgment motion and granted Ms. Wilson's summary judgment motion, directing that judgment be entered in her favor for $650,000, plus costs. Orders to that effect were entered on August 21, 2009.

Within 10 days, U.S. Life and AMAIA filed a motion for reconsideration and Ms. Wilson filed a motion to alter or amend, seeking pre-judgment interest. The post-judgment motions were argued before the court on December 17, 2009. On December 22, 2009, the court entered an order denying the motion for reconsideration and granting the motion to alter or amend. It issued a new judgment that included an award of pre-judgment interest at the rate of 6% from the date of Dr. Griffith's death to the date of the judgment.

US Life and AMAIA filed their timely notice of appeal on January 5, 2010.

## APPLICABLE LAW AND STANDARD OF REVIEW

### *Applicable Law*

 The Policy does not contain a choice of law provision. When that is the case, in determining which state's law controls the construction of a contract, we apply the doctrine of *lex locus contractus. Konover Prop. Trust, Inc. v. WHE*

*Assocs.,* 142 Md.App. 476, 490, 790 A.2d 720 (2002). "Under this principle, the law of the jurisdiction where the contract was made controls its validity and construction." *Id.* (citations and internal quotations omitted). A contract is made wherever the last action occurs that is necessary to give the contract a binding effect. *Cont'l Cas. Co. v. Kemper Ins. Co.,* 173 Md.App. 542, 548, 920 A.2d 66 (2007). "The *locus contractu* of an insurance policy is the state in which the policy is delivered and the premiums are paid." *Id.* (citations and internal quotations omitted).

■ In the instant case, when the Policy came into existence in 1998, it was delivered to AMAIA in Illinois and AMAIA received the premium payments there. Therefore, the contract was formed in Illinois, and Illinois law applies to its construction. Indeed, the parties agree that Illinois law applies. Maryland law and Illinois law are the same on all relevant and dispositive legal principles in this case.

### Standard of Review

■ A circuit court may grant summary judgment when there is no genuine dispute of material fact and on the undisputed material facts the moving party is entitled to judgment as a matter of law. Md. Rule 2–501(f). A material fact is one that, depending on how it is resolved, will affect the outcome of the case. *King v. Bankerd,* 303 Md. 98, 111, 492 A.2d 608 (1985). Both prongs of the summary judgment decision are issues of law. Therefore, on appeal, we review the circuit court's ruling *de novo. Laing v. Volkswagen of Am., Inc.,* 180 Md.App. 136, 152–53, 949 A.2d 26 (2008) (citations omitted). We do so by examining the information comprising the summary judgment record and deciding the same two issues of law that were before the circuit court. *United Servs. Auto. Ass'n v. Riley,* 393 Md. 55, 67, 899 A.2d 819 (2006).

■ In this case, most of the arguments advanced by the parties on appeal were raised in their motions for summary judgment. Some were raised by the appellants in their mo-

tion for reconsideration. The standard for review of the denial of a motion for reconsideration is abuse of discretion. *Wilson–X v. Dep't of Human Res. ex rel. Patrick,* 403 Md. 667, 674–75, 944 A.2d 509 (2008). A decision that is legally incorrect is an abuse of discretion. *See Corapcioglu v. Roosevelt,* 170 Md.App. 572, 609, 907 A.2d 885 (2006). For all intents and purposes, therefore, we are reviewing all aspects of the summary judgment decision *de novo.*

## DISCUSSION

## I.

### *LIABILITY OF U.S. LIFE*

#### *Parties' Contentions*

With one exception, which we shall identify below, U.S. Life contends there is no genuine dispute of material fact and, as a matter of law, the Policy was not in force when Dr. Griffith died. Its argument is as follows.

US Life maintains that the 31–day grace period for payment of the May 15, 2007 premium, as established in the "**GRACE PERIOD**" clause of the Policy, was in effect and was not extended. Specifically, U.S. Life takes the position that the "**REMINDER NOTICE,**" which advised that, "[t]o assure active coverage, full payment of the premium must be received no later than 60 days from the [May 15, 2007] due date," did not extend the 31–day grace period to 60 days. This is so, it reasons, because the Policy stated that the grace period could be extended by "written notice" and there was no mention in the "**REMINDER NOTICE**" of the words "grace period," nor was there any language to the effect that the "**REMINDER NOTICE**" constituted an extension of the grace period. Also, the Policy language stated that a notice of extension of the grace period "will state the date insurance will end if the premium remains unpaid"; and there was no such date set forth in the "**REMINDER NOTICE.**"

US Life further maintains that, because the grace period was not extended, the overdue premium had to be paid by June 15, 2007, for the Policy to remain in effect. The overdue premium was not paid by then, and therefore the Policy lapsed the next day (June 16, 2007). The Policy could have been reinstated thereafter, as by its terms reinstatement was permitted within 90 days of the due date of the overdue premium (*i.e.*, within 90 days after May 15, 2007). If reinstatement were to take place more than 31 days after the end of the grace period (*i.e.*, after July 16, 2007, by U.S. Life's calculation), however, evidence of insurability had to be submitted and approval by U.S. Life was required. Dr. Griffith's effort to reinstate the Policy took place after July 16, 2007, and he did not submit evidence of insurability. Therefore, the Policy was not reinstated and was not in force when Dr. Griffith died on July 28, 2007.

Alternatively, U.S. Life maintains that, if the grace period in fact was extended to 60 days by virtue of the **"REMINDER NOTICE,"** so that Dr. Griffith's effort to reinstate the Policy took place within 31 days of the end of the grace period (which meant under the **"REINSTATEMENT"** clause that he could reinstate without evidence of insurability and without U.S. Life's approval), reinstatement was not effective because it was not accomplished before Dr. Griffith died. The **"LAPSE NOTICE"** advised that to reinstate the Policy, the overdue premium payment had to be "received" by AMAIA; and by July 30, 2007—the date that AMAIA received the check for the overdue premium—Dr. Griffith already was dead.

In this alternative argument, U.S. Life further maintains that, even if receipt were not required, "payment," within the meaning of the Policy's **"REINSTATEMENT"** clause, would not occur until the check actually was paid to the payee (here, AMAIA), *i.e.*, until the check was negotiated. It asserts that, because Dr. Griffith's check for the overdue premium was not delivered to AMAIA until July 30, 2007, and was dated July 30, 2007, as well, AMAIA could not have negotiated it until that day at the earliest. By then, Dr. Griffith was dead. US Life takes the position that, regardless of the common law

"mailbox rule," which (as we shall discuss in detail *infra*) provides that an offer requiring written acceptance is accepted when the written acceptance is deposited in the mailbox, reinstatement was not effected because the Policy required payment of the overdue premium, not mailing of payment, to accomplish reinstatement.

Finally, in its reply brief, U.S. Life raises for the first time a second alternative argument. In this argument, it asserts that there indeed is a genuine dispute of material fact that precluded the entry of summary judgment. Specifically, U.S. Life argues that whether the payment of the overdue premium was made prior to July 30, 2007, and at a time when Dr. Griffith still was alive, is in genuine dispute and requires fact-finding to resolve.

Ms. Wilson counters that the **"REMINDER NOTICE"** extended the grace period from 31 days to 60 days. She asserts that the Policy did not require specific language to be used for an extension, and the **"REMINDER NOTICE"** extended the grace period when it stated: "To assure active coverage, full payment must be received no later than 60 days from the due date." The due date was listed as May 15, 2007. Under the original grace period, the Policy would have lapsed for non-payment on June 15, 2007. Pursuant to the **"REMINDER NOTICE,"** the Policy would not lapse until July 14, 2007. This, Wilson argues, was a clear extension of the grace period.

Based on the foregoing, Ms. Wilson takes the position that the Policy lapsed on July 14, 2007. She further maintains that the Policy's **"REINSTATEMENT"** clause permitted Dr. Griffith to reinstate it within 90 days after the May 15, 2007 premium due date. His actions to reinstate the Policy took place within that period. Because the grace period was extended so its last day was July 14, 2007, the reinstatement effort took place within 31 days of the end of the grace period; therefore Dr. Griffith was not required by the terms of the Policy to submit evidence of insurability or to obtain U.S. Life's approval to effect a reinstatement. Simply paying the

overdue premium before August 14, 2007, was sufficient to reinstate the Policy (so long as Dr. Griffith still was alive), and it is undisputed that Dr. Griffith did so.

Ms. Wilson asserts that the Policy was reinstated before the date of Dr. Griffith's death (July 28, 2007), and therefore was in force when he died. She maintains that neither the "**RE-MINDER NOTICE**" nor the "**LAPSE NOTICE**" altered the terms of the Policy, and the Policy did not condition reinstatement upon AMAIA's *receipt* of the overdue premium payment. Rather, all that was required by the Policy to accomplish reinstatement was *payment* of the overdue premium. Ms. Wilson further maintains that the "mailbox rule" determines when the premium payment was made; and application of that rule reveals that the overdue premium payment was made either on July 23, 2007, when Dr. Griffith accessed his on-line bank account and directed that the premium be paid, or at the latest on July 25, 2007, when, according to the relevant Bank of America documents, the check for $369.46 "was sent to AMA Insurance Agency." In either case, payment of the overdue premium occurred before Dr. Griffith's death.

Finally, Ms. Wilson argues that payment was made at the latest on July 25, 2007, notwithstanding that the check for the overdue premium was dated July 30, 2007, and was not received by AMAIA until that date. Because payment was made before Dr. Griffith died, and was made timely and in compliance with the "**REINSTATEMENT**" clause in the Policy, the Policy was in force when Dr. Griffith died.

As noted, U.S. Life's argument that there is a genuine dispute of material fact as to the time of payment was not raised below, and only was raised for the first time on appeal in its reply brief. Accordingly, Ms. Wilson was not in a position to respond to that argument in writing.

### *Analysis*

### (A)

### *"REMINDER NOTICE"/"GRACE PERIOD"*

An insurance policy is a contract, and therefore the law of contract interpretation controls its meaning. *Outboard*

*Marine Corp. v. Liberty Mutual Ins.*, 154 Ill.2d 90, 108, 180 Ill.Dec. 691, 607 N.E.2d 1204 (Ill.1992). *Accord, Mattingly Constr. v. Hartford Underwriters*, 415 Md. 313, 326, 999 A.2d 1066 (2010). Under Illinois law, when construing the terms of an insurance policy, the court seeks to ascertain the parties' intentions. *Id. Accord, Mattingly Constr.*, 415 Md. at 327, 999 A.2d 1066. "[T]he court must construe the policy as a whole, with due regard to the risk undertaken, the subject matter that is insured and the purposes of the entire contract." *Outboard Marine Corp.*, 154 Ill.2d at 108, 180 Ill.Dec. 691, 607 N.E.2d 1204 (citations omitted). *Accord, Consumers Life Ins. Co. v. Smith*, 86 Md.App. 570, 574, 587 A.2d 1119 (1991). If the policy's language is unambiguous, the court must afford the words in the policy their plain, ordinary, and popular meaning. *Outboard Marine Corp.*, 154 Ill.2d at 108, 180 Ill.Dec. 691, 607 N.E.2d 1204. *Accord, Mattingly Constr. Co.*, 415 Md. at 326, 999 A.2d 1066. Whether the words of a contract, including an insurance policy, are ambiguous is a question of law that a reviewing court decides *de novo. Bd. of Managers v. Green Trails Improvement Ass'n*, 404 Ill.App.3d 184, 190, 343 Ill.Dec. 312, 934 N.E.2d 636 (2010). *Accord, Ocean Petroleum v. Yanek*, 416 Md. 74, 86, 5 A.3d 683 (2010).

■ It is undisputed that Dr. Griffith's first premium payment for 2007 was due on May 15 of that year, and that he failed to timely make payment. The first issue we must decide is whether the 31–day grace period was extended; specifically, what effect, if any, the **"REMINDER NOTICE"** had on the 31–day grace period. We repeat the **"GRACE PERIOD"** Policy provision that allowed for an extension:

United States Life may extend the grace period by written notice. Such notice will state the date insurance will end if the premium remains unpaid.

■ This contract language is unambiguous. It gave U.S. Life discretionary authority to extend the 31–day grace period, and specified the means for doing so: by a written notice of an extension stating when the insurance coverage would end if the overdue premium were not paid within the extended

grace period. Here, written notice was given in the form of the **"REMINDER NOTICE."** Indeed, the parties do not dispute that. Furthermore, although the appellants assert that the **"REMINDER NOTICE"** did not reference "the date insurance will end," it plainly did so. The notice stated: "To assure active coverage, full payment of the premium must be received no later than 60 days from the due date." The **"REMINDER NOTICE"** identified the "due date" as May 15, 2007. Thus, the **"REMINDER NOTICE"** made evident that, if the premium were not paid, the insurance coverage would end on July 14, 2007, which was 60 days after May 15, 2007. A written reference to 60 days after May 14, is no different than a written reference to July 14, 2007. A reasonable insured, upon receiving the **"REMINDER NOTICE,"** would think that U.S. Life had exercised its right to extend the Policy's grace period until July 14, 2007.

Because the **"REMINDER NOTICE"** issued by U.S. Life satisfied the requirements of a grace period extension under the plain language of the Policy, it operated to extend the grace period until July 14, 2007. It is undisputed that payment was not made by then. Accordingly, the Policy lapsed on July 15, 2007. At that point, there only could be coverage under the Policy if it were reinstated, in accordance with the Policy's **"REINSTATEMENT"** clause.

### (B)

### *REINSTATEMENT*

The **"REINSTATEMENT"** clause of the Policy required any reinstatement to "be made within 90 days after the due date of the first unpaid premium." In this case, that due date was May 15, 2007, and hence the outside limit for reinstating the Policy was August 13, 2007. Also according to the **"REINSTATEMENT"** clause, "within 31 days after the end of the Grace Period," the Policy could be reinstated simply by paying the "overdue premium," without the need to submit evidence of insurability and obtain the approval of U.S. Life. Here, the Policy's 31-day grace period was extended to 60 days, as we

have explained, ending on July 14, 2007. Thirty-one days thereafter fell on August 14, 2007. As that date was one day past the 90–day limit, the last day to reinstate the Policy merely by paying the overdue premium was August 13, 2007. In any event, if the Policy was reinstated at all, the reinstatement predated August 13, 2007. Of course, as the risk covered by the Policy was Dr. Griffith's death, for reinstatement of coverage to be effective, it had to have been accomplished when Dr. Griffith still was alive.

As noted already, U.S. Life takes the position, based on the language used in the **"REMINDER NOTICE"** and the **"LAPSE NOTICE,"** that reinstatement could not occur until Dr. Griffith's overdue premium payment was *received* by AMAIA, at its office in Chicago; and because that did not occur until the premium check was delivered to AMAIA on July 30, 2007, after Dr. Griffith had died, the Policy was not reinstated. We disagree.

 The flaw in this argument is that the language of the Policy itself, not the language in the notices, controlled the means to effect reinstatement. The Policy was not silent on the means to effect reinstatement; on the contrary, the **"RE-INSTATEMENT"** clause expressly addressed that topic. And, it did *not* state that *receipt* of the overdue premium payment was necessary to accomplish reinstatement. The relevant language of the **"REINSTATEMENT"** clause is, "reinstatement is subject to: 1. Payment of all overdue premiums." To be sure, the **"LAPSE NOTICE"** instructed that, to reinstate the Policy, Dr. Griffith was to complete the **"APPLICATION FOR REINSTATEMENT OF COVERAGE"** form and mail it together with the check for the overdue premium to AMAIA, and that the "forms must be *received* within the next 30 days." (Emphasis added.) Neither U.S. Life nor AMAIA as its agent could unilaterally alter the terms of the Policy, however. *Mundelein v. Evanger*, 132 Ill.App.2d 179, 181, 269 N.E.2d 325 (1971). *Accord, Cambridge Techs., Inc. v. Argyle Indus.*, 146 Md.App. 415, 433, 807 A.2d 125 (2002).

Regardless of what the **"LAPSE NOTICE"** directed, whether reinstatement was accomplished was controlled by the language of the Policy itself. Likewise, the reference in the **"REMINDER NOTICE"** to "receipt" of the overdue premium did not serve to alter the terms of the Policy. So, reinstatement did not require *receipt* by AMAIA of the overdue premium payment; it required, in accordance with the Policy language, *"[p]ayment* of all overdue premiums." (Emphasis added). (Moreover, because the grace period had been extended, reinstatement did not require submission of evidence of insurability, notwithstanding statements to the contrary in the **"LAPSE NOTICE."**)

■■■ "Payment" is not a defined term in the Policy (nor is it defined in this context by any pertinent Illinois insurance statute). As noted above, U.S. Life argues that, for purposes of the **"REINSTATEMENT"** clause in the Policy, when "payment" was sought to be made by check, as it was here, "payment" means "negotiation." Thus, according to U.S. Life, payment of the overdue premium in this case could not have taken place until AMAIA actually had Dr. Griffith's premium check in hand, endorsed it, presented it to a bank, and transferred possession of it for value. Ms. Wilson counters that "payment" by check is defined by application of the "mailbox" rule, and that rule applies even though the transaction that resulted in the overdue premium check being sent to AMAIA was initiated electronically. Therefore, the "payment" was the check issued at Dr. Griffith's direction, and the payment was made either when Dr. Griffith first directed Bank of America to issue the check (on July 23) or at the latest when the check was sent to AMAIA (on July 25).

■■■ As noted above, insurance policies are contracts. The interpretation of a contract is a question of law, and therefore is decided by a reviewing court *de novo*. *Premier Title Co. v. Donahue*, 328 Ill.App.3d 161, 164, 262 Ill.Dec. 376, 765 N.E.2d 513 (2002). *Accord, Ocean Petroleum Co.*, 416 Md. at 86, 5 A.3d 683. The Illinois Court of Appeals has described the process of contract interpretation as follows:

The primary goal in construing a contract is to give effect to the intent of the parties. When the language of a contract is clear, a court must determine the intent of the parties solely from the plain language of the contract. The language of a contract must be given its plain and ordinary meaning. When interpreting a contract a court must consider the document as a whole, rather than focusing upon isolated portions.

*Premier Title Co.*, 328 Ill.App.3d at 164, 262 Ill.Dec. 376, 765 N.E.2d 513 (citations omitted). *Accord, Ocean Petroleum Co.*, 416 Md. at 86–87, 5 A.3d 683.

 Contract language is ambiguous when it "is susceptible to more than one reasonable interpretation." *Carey v. Richards Bldg. Supply Co.*, 367 Ill.App.3d 724, 727, 305 Ill.Dec. 492, 856 N.E.2d 24 (2006). *Accord, Ocean Petroleum Co.*, 416 Md. at 86–87, 5 A.3d 683. "To find an ambiguity . . . it is necessary that two objectively reasonable interpretations exist." *Carey*, 367 Ill.App.3d at 727, 305 Ill.Dec. 492, 856 N.E.2d 24. *Accord, Ocean Petroleum Co.*, 416 Md. at 86–87, 5 A.3d 683. Illinois recognizes the doctrine that ambiguities in a contract will be resolved against the drafter of the contract; however, a court "will resort to this doctrine, known as *contra proferentem*, only if [it] fail[s] to ascertain the intent of the parties using ordinary principles of contractual interpretation." *Premier Title Co.*, 328 Ill.App.3d at 165–66, 262 Ill.Dec. 376, 765 N.E.2d 513. The doctrine is "a last resort which may be invoked after all the ordinary interpretive guides have been exhausted." *Bunge Corp. v. Northern Trust Co.*, 252 Ill. App.3d 485, 493, 191 Ill.Dec. 195, 623 N.E.2d 785 (1993). It is not a rule of interpretation, but a means to "assign[ ] the risk of an unresolvable ambiguity to the party creating it." *Premier Title*, 328 Ill.App.3d at 166, 262 Ill.Dec. 376, 765 N.E.2d 513.

We conclude that the word "payment" in the "**REIN-STATEMENT**" clause of the Policy is not ambiguous. The meaning U.S. Life seeks to ascribe to it—negotiation of a check when payment is sought to be effected by check—is not

reasonable, and therefore does not give rise to an ambiguity. This is so for two reasons.

First, if, when speaking of a check, "payment" means "negotiation," the payee necessarily will have received the check before payment can take place. As we already have explained, the language used in the Policy does not specify that, when payment is sought to be made by check, the check must be "received" for payment to have been made. "Negotiated" is an even more specific term than "received," and one that requires receipt to have happened. The Policy simply does not use these specific, limited terms.

Second, the Policy does not use the word "payment" so as to suggest that payment by check means negotiation of the check. The **"PREMIUM PAYMENTS"** clause of the Policy states: "Payment can be made to United States Life at United States Life's Home Office or to our authorized agent." If "payment" is something that can be made to U.S. Life, at its home office, or to its agent, payment does not involve presentation of a check to a bank. The **"PREMIUM PAYMENTS"** language is inconsistent with payment meaning negotiation. Likewise, the word "payment" in the **"REINSTATEMENT"** clause, and the word "paid" in the **"GRACE PERIOD"** clause, are used so as to connote action, with the insured (or someone on his behalf) being the actor. "Reinstatement is subject to: 1. Payment of all overdue premiums . . ." and "[e]ach premium, after the first, must be paid up to 31 days after its due date" are phrases that focus on what the insured is to do, and have nothing to do with the insurer or its agent taking any action.

US Life's assertion that payment means negotiation is thus at odds with the Policy's word usage. Negotiation of a check is an act that is taken by the payee, here the insurer or its agent, not the payor. If, as U.S. Life argues, "payment" as used in the Policy means "negotiation," either it or AMAIA would be the actor; and the time of payment would be taken out of the control of the insured. Again, such a reading is inconsistent with how the word "payment" is used in the

Policy. (It also would inject a factor of arbitrariness into the time of payment. If AMAIA received a premium check on Monday and deposited it that day, payment would happen on Monday. If the check were not deposited until Friday, however, payment would not happen until Friday.)

For these reasons, "[p]ayment of all overdue premiums" as that phrase is used in the **"REINSTATEMENT"** clause of the Policy is something that is accomplished by the insured, not by the insurer, and cannot reasonably mean negotiation of a check sent by the insured to the insurer. By custom and practice, the appellants permitted payments on the Policy premiums to be made by check. (In addition, the **"BILL NOTICE," "REMINDER NOTICE,"** and **"LAPSE NOTICE"** all contained instructions to "[m]ake check payable" to AMAIA.) The plain and ordinary meaning of the payment phrase in the **"REINSTATEMENT"** clause of the Policy is that the insured's check for the overdue premium is the "payment" of the overdue premium that is made. The issue, given that "payment" is used in an active sense in the Policy, is the timing of that payment, *i.e.*, when is the payment made by the insured? To answer that question, we must examine the payment transaction in context.

Insurance contracts initially are formed when an insurer unconditionally accepts an insured's application, which constitutes an offer, for coverage. *Martin v. Government Employees Ins. Co.*, 206 Ill.App.3d 1031, 1039–40, 151 Ill.Dec. 926, 565 N.E.2d 197 (Ill.App.Ct.1990). *Accord, Mitchell v. AARP Life Ins. Program*, 140 Md.App. 102, 117–18, 779 A.2d 1061 (2001). From then on, the life insurance policy operates as a unilateral contract, 29 APPLEMAN ON INSURANCE 2d ("APPLEMAN") § 179.03, at 230 (2006), *i.e.*, one that is formed by performance. *See* 1 WILLISTON ON CONTRACTS § 4:8, at 462 (4th ed., Richard A. Lord, 2007) (observing that a unilateral contract is one in which one party makes a promise and the other party renders an act or forbearance). *See also Arco Petroleum Products Co. v. R & D Automotive, Inc.*, 118 Ill.App.3d 634, 638, 74 Ill.Dec. 197, 455 N.E.2d 227 (1983) (observing that "[i]t is axiomatic that an offer can be accepted by the performance

of a desired act"). *Accord, NRT Mid–Atlantic, Inc. v. Innovative Props., Inc.,* 144 Md.App. 263, 284–85, 797 A.2d 824 (2002) (stating that a unilateral contract is formed when an offer is accepted by performance). "The periodic payment of premiums is the mechanism by which the insured opts to keep the insurance policy in force." APPLEMAN § 179.0–3, at 230. Failure to pay the premiums will result in coverage lapsing.

■ Life insurance policies have standard non-forfeiture clauses that allow for reinstatement after a lapse in coverage. *See* APPLEMAN § 179.03, at 273. The **"REINSTATEMENT"** clause in the Policy in this case is such a standard non-forfeiture clause.[2] According to APPLEMAN, courts in a majority of American jurisdictions are of the view that "reinstatement [of a life insurance policy] does not involve the creation of a new contract but, instead, reinstates the original contract, under which the insured has the right to reinstatement on compliance with its requirements." APPLEMAN § 179.03, at 275. Thus, under the majority rule, reinstatement does not involve the formation of a new life insurance policy. Rather, once the requirements for reinstatement are fulfilled, the original life insurance contract is "revived." In that circumstance, there is no need for acceptance by the insurer. *See Ryman v. American Nat'l Ins. Co.,* 5 Cal.3d 620, 96 Cal.Rptr. 728, 488 P.2d 32 (1971); *Barfield v. Wilson,* 669 S.W.2d 91 (Tenn.1984); *Bruegger v. Nat'l Old Line Ins. Co.,* 387 F.Supp. 1177 (D.Wyo.1975), *aff'd as to liability, modified on other grounds,* 529 F.2d 869 (10th Cir.1976) (applying Wyoming law). A minority of jurisdictions take the contrary position that a reinstatement request by the insured is no different than an original insurance application: that is, it is an offer by the insured to enter into a new life insurance contract, which does not become effective until accepted by the insurer. *See Johnson v. Prudential Ins. Co.,* 589 F.Supp. 30 (D.D.C.1983),

---

**2.** The standard life insurance policy provision for reinstatement after lapse permits reinstatement within 30 days following expiration of a grace period, without evidence of insurability and within the lifetime of the insured, by payment of the overdue premium. *Id.*

*aff'd*, 744 F.2d 878 (1984) (applying District of Columbia law); *Ewoldt v. Am. Nat'l Ins. Co.*, 190 Neb. 290, 207 N.W.2d 521 (1973); *Foley v. New World Life Ins. Co.*, 185 Wash. 89, 52 P.2d 1264 (1936).

The Illinois appellate courts have not addressed this issue. (Nor have the Maryland appellate courts.[3]) We conclude that, if presented with the issue in this case, the Illinois courts would follow the majority rule. Aside from its being a rule followed by most of the jurisdictions considering the issue, here the circumstances under which Dr. Griffith was acting to reinstate the Policy militate strongly in favor of application of the majority rule.

Under the policy, when the relevant time frame for reinstatement is "within 31 days after the end of the Grace Period" (as it is here), the "**REINSTATEMENT**" clause is a promise by the insurer to reinstate coverage upon performance by the insured of a single act—payment of the overdue premium. In that situation, the insurer is not being asked to consider and either accept or reject an offer by the insured to enter into a life insurance contract. Thus, the plain language of the "**REINSTATEMENT**" clause of the Policy establishes that, upon payment by the insured of the overdue premium within 31 days after the end of the grace period, the Policy is revived. In other words, in that situation, the "**REINSTATEMENT**" clause is an offer of a unilateral contract to revive the Policy, with the insurer promising that revival will take place upon the insured's performing by paying the overdue premium.[4]

---

3. In *Reserve Ins. Co. v. Duckett*, 249 Md. 108, 238 A.2d 536 (1968), the Court of Appeals held that a renewal notice sent by an insurance company to its insured was an offer of insurance that was accepted when the insured mailed payment of the premium; and that resulted in the creation of a new insurance contract. In effect, this holding follows the majority rule, as it recognizes that, in an insurance policy renewal situation, the insurance company, not the insured, is the offeror, with acceptance being made by the offeree.

4. The analysis might differ if reinstatement had been sought more than 31 days after the end of the grace period, so that Dr. Griffith would

■ It is within the context of Dr. Griffith's acceptance by performance (that is, by payment of the overdue premium) of U.S. Life's offer to revive the Policy that we must determine *when* payment took place. At common law, what is often called the "mailbox rule," the "dispatch rule," or sometimes the "postal acceptance rule" is the widely-adopted convention for pinpointing the time that an offer is accepted and a contract is formed. Illinois, like Maryland, recognizes the rule, by which "the mailed acceptance of an offer is effective when mailed, not when received or acknowledged." *Martin,* 206 Ill.App.3d at 1042, 151 Ill.Dec. 926, 565 N.E.2d 197. *See also Wagner v. McClay,* 306 Ill. 560, 563–64, 138 N.E. 164 (1923) (recognizing that a letter of acceptance of a contract that is properly deposited in the mail makes the acceptance binding); *Hinc v. Lime–O–Sol Co.,* 382 F.3d 716, 719 (7th Cir.2004) (discussing Illinois law and citing RESTATEMENT (SECOND) OF CONTRACTS § 63 (1979), and stating, "The common law mailbox rule provides that once an offer is made, acceptance is effective when the offeree puts the signed contract in the mail"). *Accord, Cochran v. Norkunas,* 398 Md. 1, 24–25, 919 A.2d 700 (2007) ("The well established rule is that in the absence of any limitation or provision to the contrary in the offer, the acceptance of the offer is complete and the contract becomes binding on both parties when the offeree deposits the acceptance in the post box."); *Reserve Insurance Co.,* 249 Md. at 117, 238 A.2d 536 (explaining that the "postal acceptance rule" first was adopted in *Adams v. Lindsell,* 1 Barn & Ald. 681, 106 Eng. Rep. 250 (1818, King's Bench)).

Section 63(a) of the RESTATEMENT (SECOND) OF CONTRACTS (1979), while not using any of the familiar mailbox rule nomenclature, recognizes with respect to the time that acceptance of

---

have been required to submit evidence of insurability and obtain U.S. Life's approval. In that situation, Dr. Griffith would have been making an offer to enter into a life insurance contract to U.S. Life, which could have accepted or rejected it, within its discretion. If accepted, a new contract would have been formed, albeit with the same terms as in the original contract of insurance. That is not what happened here, however.

an offer takes effect that, unless an offer states otherwise, "an acceptance made in a manner and by a medium invited by the offer is operative and completes the manifestation of mutual assent as soon as put out of the offeree's possession, without regard to whether it ever reaches the offeror." The rationale for the rule, as explained in comment (a) to that subsection, is, essentially, certainty and predictability. The comment observes that, even though it may be possible under United States postal regulations for a sender to stop delivery and reclaim a letter, it remains the case that one to whom an offer has been made "needs a dependable basis for his decision whether to accept," and has such a basis when he knows that, once properly dispatched, his acceptance is binding and the offer cannot be revoked. *Id.*

In 2 WILLISTON ON CONTRACTS § 6:32 (4th ed. Richard A. Lord, 2007) ("WILLISTON"), the author explains that the "dispatch rule" applies equally to bilateral and unilateral contracts. If an offer for a unilateral contract calls for the performance of an act by the offeree that can be accomplished by sending money through the mail, including in the form of a check, "as soon as the money is sent it would become the property of the offeror, and the offeror would become bound to perform its promise for which the money was the consideration." *Id.* at 441–42 (footnote omitted). *See e.g. Hagerl v. Auto Club Group Ins. Co.,* 157 Mich.App. 684, 403 N.W.2d 197 (1987) (holding that an offer to renew an automobile liability insurance policy was accepted by the insured by mailing his check, even though the check subsequently was dishonored); *Pennsylvania Lumberman's Mut. Fire Ins. Co. v. Meyer,* 126 F. 352 (2nd Cir.1903) (holding that insured's property insurance policy was reinstated when insured mailed a check for the overdue premium). The offeror must have authorized the use of the particular medium (in the cases above, the mail) as a means of acceptance, and the acceptance must have been properly dispatched. *See* WILLISTON §§ 6:35 and 6:36, respectively.

In addressing with particularity when acceptance is dispatched, WILLISTON states: "An acceptance is dispatched with-

in the meaning of the rule under consideration when it is put out of the possession of the offeree and within the control of the postal authorities, telegraph operator, or other third party authorized to receive it." § 6:37, at 484. However, "mere delivery of an acceptance to a messenger with directions to mail it amounts to no acceptance until the messenger actually deposits it in the mail." *Id.* The treatise continues:

> The private delivery service, under the modern view, would have to be independent of the offeree, reliable both in terms of its delivery obligations and record keeping, and of a type that would customarily be used to communicate messages of this sort. Such agencies as the United Parcel Service, Federal Express, or even private messenger services in urban areas would qualify, and as soon as the communication leaves the offeree's possession and is placed with an authorized recipient of the instrumentality, an effective dispatch will be deemed to have occurred.

WILLISTON § 6:37, at 486–87 (emphasis added) (footnote omitted). *See also* CORBIN ON CONTRACTS § 3.24, at 440 (Revised Ed. Joseph M. Peillo) (1993) (stating that the dispatch rule establishes when the contract is formed so as to uniformly and definitely designate which of the parties is to carry the risk of "loss and inconvenience").

We conclude that the long-recognized mailbox rule governing the time of formation of a contract by written acceptance applies in the case at bar to control the time the Policy was reinstated, that is, when coverage under the Policy was revived. The transaction at issue here is not wholly traditional, that is, one in which a paper document, whether a check or otherwise, is mailed by the offeree to the offeror, in that it began electronically, as an on-line banking directive by Dr. Griffith on July 23, 2007. The Bank of America documents in the summary judgment record show, however, that the directive was acted upon by preparation of a paper check drawn on a JP Morgan Chase Bank, N.A. account under Dr. Griffith's name, and bearing his "Authorized Signature"; and that the paper check then was "sent" to AMAIA on July 25, 2007, coming into AMAIA's physical possession on July 30, 2007.

The transaction thus resembles a traditional acceptance by writing mailed to the offeror, in that a writing (the check) was "sent" to AMAIA, even though its creation was directed electronically and it was created not by the offeree but by his bank. A writing thus was generated by actions taken by Dr. Griffith; the writing complied with that which was necessary to accept the reinstatement offer; and the writing was "sent," which was a permissible mode of acceptance, and subsequently was delivered to AMAIA, the proper recipient. The nature of the transaction, involving the sending of a written acceptance, is such that, just like a transaction in which a written acceptance is prepared in writing and mailed, or a written acceptance is prepared by telegram and sent, the mailbox rule is a necessary tool to establish the time that the new agreement— here, one to revive a prior contract—was formed. *See* WILLI- STON § 6:33, at 448 (explaining that the dispatch rule for acceptance by mail generally has been applied by analogy to acceptance by telegraph). The nature of the transaction is not akin to those that have been determined to be outside the sphere of the dispatch rule. *See* WILLISTON § 6:34, at 450 (explaining that the dispatch rule has not been applied to " 'substantially instantaneous two-way communication de- vices,' " such as telephones or teletypes, as they do not resem- ble communication by mail (quoting RESTATEMENT (SECOND) OF CONTRACTS (1979) § 64)).[5]

---

**5.** Section 6:41 of WILLISTON provides a thorough discussion of "three statutes which have a significant potential impact on electronic con- tracting." *Id.* at 528. They are the federal Electronic Signature in Global and National Commerce Act ("E–SIGN"), 15 U.S.C. §§ 7001, *et seq.;* the Uniform Electronic Transactions Act ("UETA"); and the Uniform Computer Information Transactions Act ("UCITA"). "E– SIGN is designed mainly to validate the development of technology and the uses of that technology by business people that have outpaced the law's development. . . ." *Id.* at 529.

UETA has been adopted in all but four states; Illinois has not adopted it, but since 1999 has had its own "Electronic Commerce Security Act." 5 ILCS 175/1–101, *et seq.* (Maryland's version of the UETA is codified at CL section 21–101, *et seq.*) WILLISTON emphasizes with respect to E–SIGN and the UETA, in discussing the mailbox rule as applied to electronic records:

Application of the mailbox rule to the undisputed material facts in this case produces the legal conclusion that the date of payment of the overdue premium was July 25, 2007. On July 23, 2007, Dr. Griffith electronically instructed Bank of America, as his agent, to make payment to AMAIA. The evidence viewed most favorably to the appellants supports a reasonable inference that Dr. Griffith could have reinstructed Bank of America not to make the payment; therefore, as of July 23, 2007, he had set in motion the means to accept the offer of reinstatement but still had the power to reverse course. On July 25, 2007, however, Bank of America remitted payment to AMAIA by *sending* it a check, drawn on the J.P. Morgan Chase Bank, N.A. account, for $369.46. At that point, the permissible means for acceptance was in motion and, so far as is established by the common law mailbox rule, was beyond Dr. Griffith's power to stop. This would be true whether Bank of America sent the check through the United States Postal Service, a courier service, or otherwise.

 As explained above, U.S. Life also asserts with respect to the time that payment took place that payment could not have been made before July 30, 2007, the day the check was delivered to AMAIA, because the check was dated July 30, 2007. It argues that the check thus was postdated (*i.e.*, transmitted by Dr. Griffith to AMAIA before July 30, 2007, but dated July 30, 2007), and was not a valid payment of anything until July 30, 2007. Accordingly, regardless of the

---

[I]t must be borne in mind that neither UETA nor E–SIGN is intended to provide substantive rules of law; rather, each is essentially designed principally to validate electronic transactions, records and signatures. Thus, while it may be appropriate to apply the so-called "mailbox rule" or "dispatch rule" to electronic acceptances, making the acceptance of an offer by electronic means effective upon the dispatch of the acceptance by the offeree, if it is it will be due to other state laws, and not because of UETA.

*Id.* at 544–45.

The UCITA only has been enacted in two jurisdictions, of which Maryland is one. (Virginia is the other.) *See* CL section 22–101, *et seq.* It concerns computer information agreements. *Id.* at 556.

None of the parties have cited any of these statutes or taken the position that they have any application to the issues in this appeal.

application of the mailbox rule, Dr. Griffith's payment of the overdue premium did not take place until July 30, 2007, which was after his death. Of course, a lapsed life insurance policy cannot be reinstated after the insured's death.

The Uniform Commercial Code ("UCC") as adopted in Illinois (and in Maryland as well) does not support U.S. Life's analysis. The check in this case was a negotiable instrument. *See* § 810 ILCS 5/3–104(c); *accord,* Md.Code (2002) § 3–104(c) of the Commercial Law Article ("CL"). It was payable on demand and drawn on a bank. UCC section 3–113, entitled "Date of instrument," sets forth the general rule as follows, at subsection (a):

An instrument may be antedated or postdated. The date stated determines the time of payment if the instrument is payable at a fixed period after date. Except as provided in § 4–401(c) [§ 810 ILCS 5/4–401, *accord,* CL § 4–401(c) ], an instrument payable on demand is not payable before the date of the instrument.

§ 810 ILCS 5/3–113(a). *Accord,* CL § 3–113(a). The identified exception states in relevant part:

A bank may charge against the account of a customer a check that is otherwise properly payable from the account, even though payment was made before the date of the check, unless the customer has given notice to the bank of the postdating describing the check with reasonable certainty[.]

§ 810 ILCS 5/4–401(c). *Accord,* CL § 4–401(c).

Under the exception to UCC section 3–113(a) set forth in UCC section 4–401(c), the check for $369.46 that "was sent to AMA Insurance Agency on [Wednesday] 07/25/07," according to the Bank of America documents in the summary judgment record, was payable from the time it came into existence (on July 25, 2007), even though it was dated July 30, 2007, unless Dr. Griffith gave notice otherwise; and there is nothing in the summary judgment record to show or suggest that Dr. Griffith did so. *See Rybak v. Dressler,* 178 Ill.App.3d 569, 580, 127 Ill.Dec. 366, 532 N.E.2d 1375 (1988) (under Illinois law, a

postdated check is valid). In the absence of evidence of any such notice by Dr. Griffith, the July 30, 2007 check was valid and properly payable on July 25, 2007.

As we have mentioned, the appellants present for the first time on appeal an alternative argument that, if the mailbox rule applies, there are genuine disputes of material fact that should have precluded the grant of summary judgment in favor of Ms. Wilson. This argument was not advanced below; on the contrary, before the circuit court, the appellants took the opposite position, that there were no genuine disputes of material fact. The argument is not properly before us on appeal, *see* Md. Rule 8–131(a), and we are loathe to address it when Ms. Wilson, as the appellee, could not address it in her brief. We observe, however, that from our review of the summary judgment record, the material facts necessary to determine whether and when reinstatement of the Policy took place are available and are not in genuine dispute.

For all these reasons, we hold that the Policy was reinstated effective July 25, 2007, three days before Dr. Griffith died, and therefore was in force when he died. It was undisputed that Dr. Griffith's death was an accident under the terms of the Policy. The circuit court therefore properly entered judgment in favor of Ms. Wilson against U.S. Life for $650,000, plus pre-judgment interest.

## II.

### *LIABILITY OF AMAIA*

#### *Parties' Contentions*

AMAIA contends it cannot be held liable in this case because Ms. Wilson alleged a breach of contract, and AMAIA was not a party to the Policy (*i.e.,* the insurance contract). On the contrary, AMAIA is a third-party administrator. Ms. Wilson responds that the evidence on the summary judgment record established that AMAIA acted alone in denying her claim under the Policy. It did not transmit the claim to U.S. Life, or otherwise advise U.S. Life of the claim, but denied it

based upon its own determination that the Policy had lapsed and was not reinstated. Ms. Wilson maintains that under that circumstance AMAIA is subject to liability for breaching the Policy.

## Analysis

AMAIA was not a party to the Policy. Only U.S. Life and Dr. Griffith were parties to the Policy; and only U.S. Life promised, under the terms of the Policy, to pay death benefits upon proof of Dr. Griffith's death at a time when the Policy was in force. As noted, AMAIA was the third party administrator for U.S. Life. In that role, it was acting as the agent of U.S. Life, a disclosed principal.

Illinois law is clear that an agent acting on behalf of a disclosed principle is not liable for the contractual obligations of the principal unless there is an express agreement to the contrary. *The Chicago Title and Trust Company v. De Lasaux*, 336 Ill. 522, 526, 168 N.E. 640 (1929) (stating, "Where an agent in making a contract discloses his agency and the name of his principal, or where the party dealing with the agent knows that the agent is acting as an agent in making the contract, the agent is not liable on the contract unless he agrees to be personally liable"); *Mehta v. John Hancock Mutual Life Insurance Company*, 153 Ill.App.3d 145, 151, 106 Ill.Dec. 239, 505 N.E.2d 1030 (1986) (observing that "an agent for an insurance company is not personally liable as a party to the contract when he expressly discloses his agency or the person dealing with him knows of the agency"). *See also Gieseke v. Hardware Dealers Mutual Fire Insurance Company*, 46 Ill.App.2d 131, 142, 195 N.E.2d 32 (1963) (stating, "If a contract is made with a known agent acting within the scope of his authority for a disclosed principal, the contract is that of the principal alone, unless credit has been given expressly and exclusively to the agent, and it appears that it was clearly his intention to assume the obligation as a personal liability, and that he has been informed that credit has been extended to him alone." (quoting 2 AM. JUR. Agency, sec. 315)). *Accord, Curtis G. Testerman Co. v. Buck*, 340 Md. 569, 576, 667 A.2d

649 (1995) (stating, "The rule in Maryland is clear that 'if an agent fully discloses the identity of his principal to the third party, then, absent an agreement to the contrary, he is insulated from liability....' ").

The evidence in the summary judgment record in this case establishes that at all times AMAIA was acting as the agent of U.S. Life, a disclosed principal. Regardless of whether AMAIA itself denied Ms. Wilson's claim under the Policy, and regardless of whether it submitted the claim to U.S. Life, it still was acting as the agent of U.S. Life as the disclosed principal. And there was no evidence that AMAIA independently agreed to be liable on the Policy. Accordingly, the undisputed material facts established that AMAIA had no contractual obligation to Ms. Wilson as the beneficiary under the Policy. The circuit court's ruling that AMAIA was liable jointly and severally with U.S. Life for breach of the Policy, for failure to pay the death and accidental death benefits to Ms. Wilson, was incorrect. Summary judgment thus was granted in favor of Ms. Wilson against AMAIA in error.

In the appellants' motion for summary judgment, AMAIA sought entry of judgment in its favor on the ground that on the undisputed material facts it had no contractual obligation under the Policy to pay any benefits to Ms. Wilson. For the reasons we just have explained, AMAIA's summary judgment argument was meritorious. Ordinarily, however, a circuit court has discretion to deny summary judgment in favor of a party even though the party has properly moved for summary judgment and shown that it is entitled to judgment in its favor as a matter of law. Md. Rule 2–501.

In this situation, we conclude that, had the circuit court correctly determined, as a matter of law, that Ms. Wilson was not entitled to judgment against AMAIA because AMAIA had no contractual obligation under the Policy, it would have been an abuse of discretion for the court not to have granted summary judgment in favor of AMAIA. There was no genuine dispute of material fact regarding AMAIA's role and actions in this case, and the question whether AMAIA could

be liable for breaching the Policy was squarely presented in the cross-motions for summary judgment. There would have been no rational basis on which to deny AMAIA's motion for summary judgment had the court properly denied Ms. Wilson's motion for summary judgment against AMAIA. We therefore shall reverse the judgment against AMAIA and remand the case to the circuit court with instructions to enter judgment in favor of AMAIA.

**JUDGMENT IN FAVOR OF ELIZABETH WILSON AGAINST THE UNITED STATES LIFE INSURANCE COMPANY IN THE CITY OF NEW YORK AFFIRMED. JUDGMENT IN FAVOR OF ELIZABETH WILSON AGAINST AMA INSURANCE AGENCY, INC., REVERSED AND CASE REMANDED TO THE CIRCUIT COURT FOR BALTIMORE CITY WITH INSTRUCTIONS TO ENTER JUDGMENT IN FAVOR OF AMA INSURANCE AGENCY, INC. COSTS TO BE PAID ONE–HALF BY UNITED STATES LIFE INSURANCE COMPANY IN THE CITY OF NEW YORK AND ONE–HALF BY ELIZABETH WILSON.**

