58 A.3d 497

**TIG INSURANCE COMPANY**

v.

**MONONGAHELA POWER COMPANY, et al.**

No. 2842, Sept. Term, 2010.

Court of Special Appeals of Maryland.

Dec. 21, 2012.

Frank J. Mastro (Stephen S. McCloskey, Semmes, Bowen, Semmes, Baltimore, MD, Carlos Del Carpio, James J. Hickey, Meckler, Bulger, Tilson, Marick & Pearson, LLP, Chicago, IL), on the brief, for Appellant.

Gerald P. Konkel, Washington, D.C. (Morgan, Lewis & Bockius, LLP, Washington, D.C., David A. Luttinger, Jr., Morgan, Lewis & Bockius, LLP, New York, NY), on the brief, for Appellee.

Panel: DEBORAH S. EYLER, MEREDITH, WATTS, JJ.

WATTS, J.

Appellant, TIG Insurance Company, appeals the Circuit Court for Washington County's grant of appellees'—Allegheny Energy, Inc., Monongahela Power Company, The Potomac Edison Company, West Penn Power Company, and Allegheny Energy Supply Company, LLC—motion for partial summary judgment, and its denial, in part, of appellant's motion for partial summary judgment. After final judgment was entered in the case, appellant noted an appeal raising two issues, which we quote:

I. Whether the Circuit Court erred as a matter of law by entering summary judgment for [appellees] declaring that Pennsylvania law applies to the interpretation and application of the terms of the [insurance] Policies at issue in this case[?]

II. In the alternative, whether the Circuit Court erred as a matter of law by failing to enter summary judgment for [appellant] on the grounds that [appellant] is entitled to a set-off against [appellees'] loss which reflects the settling insurers' proportionate shares of coverage responsibility for the loss[?]

For the reasons set forth below, we answer the questions in the negative. We shall, therefore, affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Although there were many entities involved in the lawsuit before the circuit court, and the procedural history is long and complex, we include only those facts relevant to the resolution of the issues presented before this Court.

Appellee Allegheny Energy, Inc. ("Allegheny"), "a corporation of the State of Maryland[,]" is the holding company of appellees Monongahela Power Company, The Potomac Edison Company, West Penn Power Company, and Allegheny Energy Supply Company, LLC.[1] Since 1949, Allegheny has purchased both project specific and comprehensive general liability insurance policies from various insurers, including Certain Underwriters at Lloyd's, London and London Market Companies ("London") and North River Insurance Company ("North River").[2] Among nineteen general liability insurance policies that North River issued to Allegheny were four Excess Insurance Policies--Policy Nos. 522–051804–9, 522–051805–8, 522–

---

1. As appellee Allegheny, the parent company for the other appellee companies, signed all insurance contracts at issue in this case, we will refer to appellees collectively as "Allegheny" throughout this opinion.

2. Appellant acts on behalf of North River by virtue of a power of attorney.

051806–7, and 522–051807–6 (the "Non–JU Policies") [3]—covering a policy period from October 31, 1984, through October 31, 1985. On each of the Non–JU Policies, Allegheny's address is listed as "320 Park Avenue, New York, New York 10022[.]"

The Non–JU Policies provided that the insurer agreed to indemnify Allegheny for loss exceeding the amount of loss payable by underlying policies over $5,000,000.[4] The underlying policy listed on each Non–JU Policy is Associated Electric & Gas Insurance Services Limited ("AEGIS") Policy No. 195 ANJ (the "AEGIS Policy"), which covered the same policy period as the North River policies. Liability under the AEGIS Policy had an underlying limit of $500,000 and was limited to $1,000,000 for any one occurrence. In addition, Allegheny purchased $3,500,000 in first layer excess insurance through Employers Insurance of Wausau and Twin City Fire Insurance Company.

In 2001 and 2002, Allegheny demanded that insurers indemnify it for costs related to the settlement of asbestos suits that triggered the insurers' Liability Insurance Policies. By 2003, Allegheny had informed insurers that thousands of claims were expected to be brought against Allegheny for alleged bodily injuries arising from the claimants' exposure to asbestos fibers while performing work within facilities owned and/or operated by Allegheny. On May 2, 2003, London filed a complaint (the "London Complaint") against Allegheny, as well as "other interested insurers," [5] in the circuit court re-

---

**3.** Excess Insurance Policies are policies providing coverage above general liability insurance policies once the underlying general liability insurance policies are exhausted. The four excess insurance policies referred to above are the only policies issued by North River for which the policy numbers do not begin with the letters JU. They have, thus, been referred to throughout the litigation as the "Non–JU Policies," and the remaining fifteen North River policies have been referred to as the "JU Policies."

**4.** The Non–JU Policies have underlying limits of $5,000,000, $15,000,000, $50,000,000, and $75,500,000.

**5.** Among the insurers listed as interested parties were North River and International Insurance Company, appellant's predecessor in interest.

questing declaratory judgment for the purpose of determining "the rights and legal relations" of the parties arising under the contracts of insurance entered into between Allegheny and the insurers. In essence, London sought to resolve the issue of what obligations it had under the excess insurance policies to defend or indemnify Allegheny in connection with alleged liability arising from asbestos lawsuits.

On November 17, 2003, Allegheny filed a counterclaim against London and a cross-claim against the other insurers listed in the London Complaint, including North River, seeking declaratory judgment against the insurers for breach of contract "under [the] comprehensive general liability insurance policies sold to [it]." Allegheny sought a declaration that the insurers were obligated, pursuant to the terms of the Liability Insurance Policies, to provide insurance coverage for the asbestos claims. Allegheny sought damages from insurers for their alleged failure to pay the costs for the investigation and defense of the asbestos suits and other alleged "breaches of insuring obligations[.]" On December 22, 2003, appellant filed an answer to the cross-claim "as successor in interest by merger to International Insurance Company, and on behalf of North River Insurance Company [ ] by power of attorney, as to [the] Non–JU Policies[.]"

On March 31, 2005, the circuit court granted a motion by Allegheny to realign the parties so that Allegheny was the plaintiff and the insurers were the defendants. On May 3, 2005, Allegheny filed a complaint alleging breach of contract by the named defendants, and requesting declaratory judgment and other relief. On November 12, 2008, Allegheny filed a First Amended Complaint (the "First Amended Complaint"), alleging breach of contract and requesting declaratory and other relief. The First Amended Complaint contained ten counts, including Count I for "Breach of Contract against [London], North River, Wausau, Twin City, and Commercial Union" and Count X for "Declaratory Judgment Against All Insurers."

In Count I, Allegheny contended that it was due reimbursement under the insurance policies purchased from North River and other insurers for costs incurred during litigation of asbestos claims. Allegheny argued that the insurers "refused to meet [Allegheny's] contractual demands, refused to acknowledge, accept, or undertake their contractual obligations, and have thereby breached their Liability Insurance Policies." Allegheny asserted that it sustained damages as a result of the insurers' breaches, and that it was "entitled to all direct, indirect, consequential, special, compensatory and other damages resulting from the[ ] breaches of contract." Allegheny maintained that, with regard to the breaches alleged in Count I, it was due pre-and post-judgment interest and attorney's fees and costs. In Count X, Allegheny requested that nineteen declarations be entered against insurers, including a declaration that the insurers be required to pay or reimburse Allegheny for sums it is "legally obligated or reasonably required to pay as damages by reason of bodily injury, personal injury and other damage or injury . . . in connection with the Asbestos Suits[.]"

On April 9, 2010, Allegheny filed a motion for partial summary judgment requesting that the circuit court find that Pennsylvania Law applies to the 1974 to 1980 London comprehensive general liability insurance policies and that, as a result, it (Allegheny) was entitled to select which policy (from 1974 to 1980) to respond first to in the asbestos suits.

Allegheny contended that, since 1970, "all of Allegheny's insurance procurement functions have been centralized in the Allegheny Insurance Department . . ., which has [ ] offices on Cabin Hill Drive in Greensburg, Pennsylvania." (Footnotes omitted). Allegheny asserted that, "[f]rom 1970 through 1990 or 1991, the insurance broker . . . involved in procuring all of Allegheny's general liability coverage was Johnson & Higgins of Pennsylvania with its offices in Pittsburgh, Pennsylvania." (Footnote omitted). Allegheny argued that "[g]eneral liability policies that were issued to Allegheny in the 1970s and 1980s were delivered to Allegheny at its Insurance Department in Greensburg, Pennsylvania[,]" and that "[i]t was not until the

point that the insurance policy was actually physically received and reviewed by Allegheny in Greensburg at its Insurance Department office that Allegheny would pay the policy premium and considered itself bound to the policy." (Footnote omitted). Allegheny maintained that, as a result of these undisputed facts, its insurance policies are to be interpreted under Pennsylvania law because, when deciding choice-of-law questions in the interpretation of contracts, Maryland courts apply the substantive law of the state where the contract was made, *i.e.*, where the policy was delivered and the premiums were paid. Allegheny requested that the circuit court grant partial summary judgment in its favor, declaring that Pennsylvania law applied to the insurance contracts at issue and that Allegheny had the right to choose a particular policy year to respond first to in the asbestos suits.

On April 9, 2010, London filed a motion titled "Motion for Partial Summary Judgment that New York Law Applies to the General Liability Program Policies Subscribed in Favor of Allegheny," and a memorandum in support. In the memorandum, London contended that, under Maryland Law, "the interpretation and validity of a contract is governed by the law of the state where the contract is made . . . [, meaning] where the last acts necessary to make the contract binding occur and that such last acts are the delivery of the policy and payment of the premium." London argued that between July 31, 1974, and October 31, 1984, when the London and JU Policies were signed, Allegheny's corporate headquarters were in New York City, the CEO, CFO, and all department heads worked out of New York City, and the board of directors met in New York City. As to the JU Policies, London asserted that, although "discovery in this matter has not definitively revealed where the JU [P]olicies were delivered to Allegheny, it is reasonable to conclude that the JU [P]olicies, given the location of Allegheny's corporate headquarters and the fact that certain of the JU [P]olicies listed Allegheny's New York address, were delivered to Allegheny in New York."

London maintained that the London policies signed between July 31, 1974, and October 31, 1980, "were purchased by

Allegheny through the EBASCO Insurance Services program ("EBASCO")[,]" a company located in New York. According to London, EBASCO, a "Risk Manager for many [ ] utilities[,]" placed coverage for those utilities, including Allegheny, with London through Lukis Stewart, a Canadian broker. Lukis Stewart provided the policy terms to EBASCO in New York, which then communicated with its clients, including Allegheny. London contended that EBASCO collected premium payments from all of its clients at its office in New York before sending them on to Lukis Stewart, which forwarded the premiums to London. London argued that, as a result, New York law was applicable to the interpretation of the 1974 to 1984 London and JU Policies.

On April 9, 2010, appellant filed a Motion for Partial Summary Judgment and a supporting memorandum, requesting that the circuit court grant summary judgment in its favor as to the claims contained in Counts I and X of the First Amended Complaint. In a footnote contained in the memorandum in support of its motion, appellant joined in London's motion for partial summary judgment, stating as follows: "Pursuant to Maryland's choice of law rules, Allegheny has argued for the application of Pennsylvania substantive law in this action. [Appellant] join[s] in the arguments in support of the application of New York substantive law in this action made by [ ] London [ ] in their Memorandum In Support Of Their Motion[.]" Appellant made no independent substantive argument in support of the motion.

Appellant also sought partial summary judgment regarding the issue of "whether North River and [International Insurance Company] are entitled to a set-off against Allegheny's asbestos liabilities for all amounts covered by insurance policies with which Allegheny has settled its asbestos liabilities." Appellant contended that it was entitled to "a set-off against Allegheny's asbestos liabilities in the amount of the combined limits of liability of all settling policies." According to appellant, Allegheny entered into settlements with other insurers, including: (1) Insurance Company of North America, "which issued first excess layer general liability coverage to Alleghe-

ny from 1962–1969"; (2) The Home Insurance Company, "which issued first excess layer general liability coverage to Allegheny from 1969–1974"; and (3) Liberty Mutual, which "provided [comprehensive general liability] coverage to Allegheny for work performed by Contractors at the Harrison Power Plant under six separate Project Specific Policies which were in effect from October 1, 1972 to October 1, 1978." Appellant argued that "[w]hen Allegheny's paid liabilities are reduced to reflect the settling insurers' apportioned shares of liability for its asbestos loss, it becomes apparent that the remaining portions of Allegheny's paid asbestos liabilities (if any) would not exhaust the applicable underlying coverages to the Non–JU Policies, regardless of the allocation approach that is applied[.]" Under this approach, appellant would not be required to provide additional or excess insurance coverage.

On April 28, 2010, appellant filed a response to Allegheny's motion for partial summary judgment. Appellant contended that Allegheny conceded, in its motion, that the General Liability Program Policy underlying the Non–JU Policies is applicable and exceeds the coverage provided under Allegheny's Project Specific Policies, and that appellant is, therefore, entitled to a set-off as a consequence of the settlements entered into by Allegheny and other insurers.

On April 28, 2010, Allegheny filed an opposition to appellant's motion for partial summary judgment. Allegheny asserted that appellant, in its motion, failed to generate a genuine dispute of material fact as to the choice-of-law issue. Allegheny pointed out that appellant merely adopted London's argument that the JU Policies were made in New York.

On May 5, 2010, Allegheny also filed a reply in support of its motion for partial summary judgment asserting that Pennsylvania law applies to the London policies. Allegheny contended that the contract was made when the premiums were placed in the mail, in accordance with the terms of the contract-which provided that "the policies [ ] required [only] that the insured 'had paid', not that [London] 'had received'

payment[.]" Allegheny argued that, " 'in the absence of any limitation or provision to the contrary in the offer, the acceptance of [an] offer is complete and [a] contract becomes binding upon both parties when the offeree deposits the acceptance in the post box.' " (Citation omitted).

On May 11, 2010, the circuit court held a hearing on the motions for partial summary judgment to consider, *inter alia,* the choice of law and set-off issues. At the hearing, as to choice-of-law, Allegheny argued that Pennsylvania law applied to all insurance policies at issue because the policies were accepted through payment of premiums by Allegheny's insurance managers in Pennsylvania. London argued that policies in effect between 1974 and 1980 were negotiated on behalf of Allegheny by EBASCO, as an agent for Allegheny. In arguing the applicability of New York law, London contended that the premiums were sent from Allegheny to EBASCO before being forwarded to Lukis Stewart and then to London, and, as EBASCO was an agent of Allegheny, acceptance occurred in New York when EBASCO sent the premium to London's agent. Appellant "join[ed] in the arguments by" London, without adding any independent assertions as to the facts or law.

As to the appellant's liability under the Non–JU Policies, Allegheny contended as follows:

[London's] whole argument hinges on somehow a stranger to the contract, EBASCO, found Allegheny. EBASCO it is an undisputed fact was not involved with any North [R]iver [JU or Non–JU] policy. It was only involved at all in any transactions, between [19]74 and [19]80 with London. So, as with respect to [Non–JU Policies], it's Pennsylvania law and there isn't even any colorable argument to the contrary.

The circuit court ruled from the bench as follows:

... Pennsylvania law applies to the construction and effect of all policies which are the subjects of this law suit. ... The Court [ ] feels that the arguments made by counsel today and reading the written arguments, I think the strength comes down on the side of Pennsylvania law apply-

ing even to the London [ ] policies and . . . and others and in the area of efficiency the Court will find that all policies are to be construed under Pennsylvania law and that will be the binding law of this . . . in this case.

(First and second ellipsis added). The circuit court deferred ruling on the issues of "occurrence," "trigger," and "off-set." [6]

On May 21, 2010, consistent with its oral ruling, the circuit court issued an order declaring, in pertinent part, "that Pennsylvania law applies to the interpretation and application of the terms of all insurance policies at issue in the case." The circuit court "deferr[ed] argument and ruling on the issue of Off–Set raised in . . . [appellant]'s Motion for Partial Summary Judgment until after ruling on the Number of Occurrences, Trigger of Coverage, and Allocation issues."

On June 1, 2010, the circuit court issued an order declaring that Pennsylvania law applied to the interpretation of "all insurance policies at issue in the case to [Allegheny's] coverage claims" and denying any motion to the contrary.

On June 22, 2010, the circuit court issued an order granting appellant's motion for partial summary judgment as to all claims in Count I of the First Amended Complaint and denying appellant's motion for partial summary judgment as to all claims in Count X of the First Amended Complaint. On June 29, 2010, the circuit court denied London's motion for partial summary judgment, ruling, in pertinent part, as follows:

ORDERED that the relief requesting off-set of certain EBASCO policies are targeted among multiple triggered liability policy periods, as a matter of law, is DENIED.

On September 3, 2010, the circuit court issued an order scheduling a trial date as to the remaining issues for January 10, 2011. On December 3, 2010, appellant filed a pretrial statement, contending that there were no triable issues be-

6. Appellant participated in the argument only to join in the comments concerning "occurrence" made by counsel for OneBeacon, which was in attendance at, but not a party to, the hearing.

tween it and Allegheny, as the circuit court had granted summary judgment as to Count I and the request for declaratory relief in Count X was "speculative." On January 10, 2011, the circuit court held a hearing to resolve any remaining issues between appellant and Allegheny. At the hearing, Allegheny "abandon[ed]" all declarations requested in Count X other than the declarations "on defense costs[.]" The circuit court granted judgment for appellant "with respect to all [sixteen] other declarations sought by [Allegheny]" in Count X of the First Amended Complaint.

The circuit court orally ruled on the declaratory judgment issue as follows:

All right based on your various arguments, the Court will extend the principles of its June 2010 Order as a result of the various arguments that were presented on issues of trigger, coverage, allocation, setoff, number of occurrences [to the Non–JU policies.]

On the same day, January 10, 2011, the circuit court issued an order, providing as follows:

The Court finds and declares that Pennsylvania law applies to the interpretation and application of the terms of ... the "Non–JU Policies" [ ] at issue in this case.

\*　　\*　　\*

By prior order, this Court granted [appellant]'s partial summary judgment as to the claims asserted against Non[-]JU policies in Count I of Allegheny's First Amended Complaint with respect to the Non–JU Policies.

With respect to Count X of Allegheny's first amended complaint, the Declaratory Judgment Count, as Allegheny has abandoned any specific relief not resolved by this order, judgment is entered dismissing that Count as to all relief sought against [appellant] except as indicated above in this order. Notwithstanding the foregoing sentence, if Allegheny can show that the underlying limits set forth in the Non–JU Policies are satisfied pursuant to the terms of the policies with respect to a covered claim, [Allegheny is] not

precluded by such dismissal from seeking coverage for such claim.

Since this Order disposes of all of the remaining declaratory relief claims asserted in Count X of Allegheny's First Amended Complaint against [appellant] with respect to the Non–JU policies, it therefore resolves all remaining claims involving the Non–JU Policies. Since all other Defendants in this action have been or will be dismissed from this action because of settlement or otherwise, the Court finds that there is no just reason for delay and directs entry of a final judgment pursuant to Maryland Rule 2–602(b).

On February 9, 2011, appellant's notice of appeal was filed with the circuit court.

## DISCUSSION

### I.

Appellant contends that the circuit court erred in granting summary judgment in favor of Allegheny and applying Pennsylvania law to the Non–JU Policies because New York law is applicable. Appellant argues that Maryland choice-of-law rules provide that the law of the state where the contract was made governs interpretation of the contract. Appellant asserts that, as to insurance policies, Maryland "cases generally identify the place of contracting as the place at which the policy was delivered." Appellant maintains that the insurance policies at issue were delivered to Allegheny in New York, where the Allegheny corporate headquarters were located. Appellant asserts that the insurance policies display Allegheny's New York address, its principal place of business, and that Allegheny's corporate designee testified that the head of every department worked in New York during the 1980s and 1990s, and that all of the executive officers were located in New York.

Allegheny responds that the circuit court correctly applied Pennsylvania law because the insurance policies were delivered to and paid from Allegheny's Pennsylvania office. Alle-

gheny contends that Maryland courts apply the substantive law of the state where a contract is made, and that, typically, "an insurance policy is made in the state where the premiums are paid and the policy is delivered." According to Allegheny, the "[u]ndisputed evidence" demonstrated that the insurance policies were delivered to Allegheny in Pennsylvania and paid by Allegheny from the Pennsylvania office. Allegheny argues that the location of its headquarters in New York is not dispositive because its "insurance procurement functions were all located in Pennsylvania." Allegheny maintains that the listing of the New York address on the face pages of the insurance policies is not controlling because the "face page reference does not establish where the contracts were made or delivered."

In a reply brief, appellant contends that the evidence demonstrated the insurance policies were delivered to Allegheny in New York or, at a minimum, that a genuine issue of material fact exists regarding delivery of the policies. Appellant argues that the circuit court failed to "undertake any factual analysis" or make a determination regarding the delivery of the insurance policies, but rather, for "efficiency," declared that "all policies [we]re to be construed under Pennsylvania law[.]" Appellant maintains that it is not sufficient for "delivery" purposes that the insurance policies eventually went to Pennsylvania "if the policies were delivered to the insured in New York." According to appellant, "that the policies may have been forwarded from Allegheny's corporate offices in New York to a location in Pennsylvania" does not change that the policies were delivered to Allegheny in New York.

We review a trial court's grant of a motion for summary judgment *de novo*. *Town of Oxford v. Koste,* 204 Md.App. 578, 585, 42 A.3d 637, *cert. granted,* 427 Md. 606, 50 A.3d 606 (2012). Maryland Rule 2–501 governs summary judgment and authorizes summary judgment where "there is no genuine dispute as to any material fact" and "the party is entitled to judgment as a matter of law." In reviewing a grant of summary judgment under Rule 2–501, an appellate court will "independently review the record to determine whether the

parties properly generated a dispute of material fact and, if not, whether the moving party is entitled to judgment as a matter of law." *Reiter v. Pneumo Abex, LLC,* 417 Md. 57, 67, 8 A.3d 725 (2010) (citation omitted). "In order for there to be disputed facts sufficient for us to hold that granting summary judgment . . . was error, there must be evidence on which the jury could reasonably find for appellant." *Benway v. Md. Port Admin.,* 191 Md.App. 22, 46, 989 A.2d 1239 (2010) (citation omitted). In reviewing the facts, "we construe the facts properly before the court and any reasonable inferences that may be drawn from them, in the light most favorable to the non-moving party[.]" *Id.* (citation omitted).

"A material fact is a fact the resolution of which will somehow affect the outcome of the case." *King v. Bankerd,* 303 Md. 98, 111, 492 A.2d 608 (1985) (citation omitted). Disputes over "non-material" facts do not preclude the entry of summary judgment. *Id.* In reviewing a grant of summary judgment, we have held that "even if the non-moving party identifies a factual dispute, this showing will not prevent summary judgment unless the dispute concerns a 'material' fact, that is, a fact whose resolution will somehow affect the outcome of the case." *Stewart Title Guar. Co. v. West,* 110 Md.App. 114, 133, 676 A.2d 953 (1996) (citation omitted). Indeed, "[f]actual disputes that are irrelevant or unnecessary will not be counted, and when a movant has carried its burden, the party opposing summary judgment must do more than simply show there is some metaphysical doubt as to the material facts." *Seaboard Sur. Co. v. Richard F. Kline, Inc.,* 91 Md.App. 236, 244, 603 A.2d 1357 (1992) (citations and internal quotation marks omitted).

 "Insurance policies are contracts and are treated and construed like other contracts." *Cont'l Cas. Co. v. Kemper Ins. Co.,* 173 Md.App. 542, 546, 920 A.2d 66 (2007) (citation omitted). "Absent a choice-of-law provision in [a] contract, [Maryland] courts have applied the rule of lex loci contractus to matters regarding the validity and interpretation of contract provisions." *Am. Motorists Ins. Co. v. ARTRA Grp., Inc.,* 338 Md. 560, 573, 659 A.2d 1295 (1995). "Under this

principle, the law of the jurisdiction where the contract was made controls its validity and construction." *The United States Life Ins. Co. v. Wilson,* 198 Md.App. 452, 463, 18 A.3d 110 (2011) (citation omitted). "A contract is made in the place where the last act occurs necessary under the rule of offer and acceptance to give the contract a binding effect." *Cont'l Cas. Co.,* 173 Md.App. at 548, 920 A.2d 66 (citation omitted).

Maryland appellate courts have consistently held that "[t]he *locus contractu* of an insurance policy is the state in which the policy is delivered and the premiums are paid." *Id.* at 548, 920 A.2d 66 (citation omitted). *See also Cooper v. Berkshire Life Ins. Co.* 148 Md.App. 41, 55, 810 A.2d 1045 (2002), *cert. denied,* 373 Md. 407, 818 A.2d 1105 (2003); *Mut. Life Ins. Co. v. Mullen,* 107 Md. 457, 463, 69 A. 385 (1908) ("[A]s the first premium on the policy was paid in this State, by a citizen of this State, and the policy delivered here, . . . it is a Maryland contract and . . . governed by Maryland laws."). For example, in *The United States Life Ins. Co.,* 198 Md.App. at 462–63, 18 A.3d 110, we held that an insurance policy was made in Illinois because that is where the policy was delivered to the third-party insurance administrator, and where the administrator collected premium payments. In *Cont'l Cas. Co.,* 173 Md.App. at 548, 920 A.2d 66, although we did not address where the policy premiums were made, we held that Texas law governed interpretation of an insurance policy because "[i]t is not disputed that the operative policy was delivered to [the insured] in Dallas, Texas."

In *Commercial Union Ins. Co. v. Porter Hayden Co.,* 116 Md.App. 605, 676, 698 A.2d 1167, cert. denied, 348 Md. 205, 703 A.2d 147 (1997), upon reviewing our reasoning regarding the *lex loci contractus* in a previous appeal of the same case, we held that an insurance policy purchased by a Maryland company was made in New York, and that, as a result, New York law applied to interpretation of the policy.[7] Our finding was based on the following facts:

---

**7.** In *Commercial Union Ins. Co.,* 116 Md.App. at 676–87, 698 A.2d 1167, we ultimately applied Maryland law in interpreting the policy

1) the [ ] policies were issued from [the insurer's] New York office; 2) [ ] the fully executed policies were delivered to the New York office of [the insured's] insurance broker; 3) [ ] the policy premiums were paid by [the broker] to [the insurer] in New York; and 4) [ ] it was [the insured's] broker [ ] that delivered the policies to [the insured's] president at his headquarters in Baltimore.

*Id.* at 674, 698 A.2d 1167. We concluded that the final act which constituted the "making" of the policy was the delivery of the policy to the insured's agent in New York, explaining as follows:

[The broker] retained its role as the insured's agent, and [the insurer's] delivery to [the broker] constituted delivery to the insured[.] Because delivery took place in New York, each contract is deemed to have been made in New York. Accordingly, New York law governs the substantive law issues in this case.

*Id.* at 676, 698 A.2d 1167.

In this case, appellant made no independent argument regarding the choice-of-law issue before the circuit court. Rather, appellant joined the arguments made by London in its motion for partial summary judgment. London's argument consisted of two parts: (1) New York law applies to all policies purchased through the EBASCO program between 1974 and 1980, as EBASCO, an agent of Allegheny, was located in New York and the policies were delivered and premiums paid there; and (2) New York law applies to the JU Policies signed between 1980 and 1984, as Allegheny's headquarters were located in New York during that period, and it could, therefore, be assumed that the policies were delivered to New York.

Allegheny responded to the first argument by asserting that the Non–JU Policies were not purchased as part of the EBASCO program—a fact which appellant did not dispute.

because, pursuant to the doctrine of *renvoi,* we concluded that courts in New York would have applied Maryland law under the substantive law of contract interpretation in that state. Our analysis of where the contract was made, however, is instructive in this case.

London's argument regarding policies purchased through the EBASCO program is, therefore, not dispositive of the question of whether the Non–JU Policies were made in Pennsylvania or New York. The only factual information before the circuit court as to the merits of the issue was contained in the motions and affidavits submitted by the parties prior to the hearing. In the motions and affidavits, Allegheny asserted: (1) Allegheny's insurance department was located in Greensburg, Pennsylvania at the time the Non–JU Policies were made; (2) Johnson and Higgins, located in Pittsburgh, Pennsylvania, was Allegheny's insurance broker at the time that the Non–JU Policies were made; (3) it was general practice for insurance policies to be received by the insurance broker and forwarded to Allegheny's office in Greensburg, Pennsylvania; (4) Allegheny considered itself bound by a policy after the policy was received in the Greensburg, Pennsylvania office, at which point it would begin paying premiums; and (5) premium payments were made from Allegheny's office in Greensburg, Pennsylvania. Appellant—by joining London's argument— contended only that, at the time the policies were made, Allegheny was headquartered in New York. Based on this record, we conclude that the circuit court properly held that there was no genuine dispute of material fact and that Allegheny was entitled to judgment as a matter of law, *i.e.*, Pennsylvania law applied to interpretation of the Non–JU Policies, as the Non–JU Policies were made in Pennsylvania.

■ That a company is headquartered in a state does not mean that all contracts which the company enters are made in that state. *See Commercial Union Ins. Co.*, 116 Md.App. at 674–76, 698 A.2d 1167 (An insurance policy issued to a Maryland company was made in New York because the policy was delivered to an agent of the insured in New York.); *see also Cont'l Cas. Co.*, 173 Md.App. at 548, 920 A.2d 66 ("The *locus contractu* of an insurance policy is the state in which the policy is delivered and the premiums are paid." (Citation omitted)); *The United States Life Ins. Co.*, 198 Md.App. at 462–63, 18 A.3d 110 (We held that an insurance policy was made in Illinois because that is where the policy was delivered

to the third-party insurance administrator, and where the administrator collected premium payments).

Here, Allegheny contended before the circuit court that the Non–JU policies, among others, were delivered to its office in Greensburg, Pennsylvania via its broker in Pittsburgh, Pennsylvania. Appellant did not contest this assertion other than to point out that Allegheny was headquartered in New York and its department heads were stationed in New York. Appellant offered no information leading to the conclusion that the policies were delivered to New York or that the premiums were paid from New York—*i.e.*, appellant produced no "evidence on which the jury could reasonably find for appellant[,]" *Benway*, 191 Md.App. at 46, 989 A.2d 1239 (citation omitted)-and, therefore, failed to "properly generate[ ] a dispute of material fact[.]" *Reiter*, 417 Md. at 67, 8 A.3d 725 (citation omitted).

At oral argument, appellant raised a new argument not briefed in this Court or raised or argued in the circuit court— namely, that the Non–JU Policies contain language stating that the final act of contract formation occurs in the location where the policy is countersigned and issued, and that the evidence in the case demonstrates that countersigning and issuance occurred in New York. In support of the argument, appellant relied on the following clause found at the end of each of the four Non–JU Policies:

> IN WITNESS WHEREOF, the company has caused this policy to be signed by its president and secretary but this policy shall not be valid unless completed by the attachment hereto of a Declarations page countersigned by a duly authorized representative of the company.

The "company" referred to in the above clause is the insurance company, North River. Thus, North River was to countersign the Declarations page after Allegheny signed and returned it. On the Declarations page, North River is identified as having its representative broker in Chicago, Illinois, and in the policies, North River is listed as a New Jersey corporation with its home office in Morris, New Jersey. Ac-

cordingly, once Allegheny signed the Declarations pages, they were countersigned by North River either in Illinois, via a broker, or in New Jersey—not in New York. Appellant failed to provide any information demonstrating that the countersigning of the policies—by North River or any company—occurred in New York.

Equally important, countersigning of the policies was not the last act necessary to give the policies binding effect. This Court has stated that "[a] contract is made in the place where the last act occurs necessary under the rule of offer and acceptance to give the contract a binding effect." *Cont'l Cas. Co.*, 173 Md.App. at 548, 920 A.2d 66 (citation omitted). Here, Allegheny made an offer to buy insurance coverage from North River, which North River accepted by writing, signing, and sending a policy to Allegheny. Once the policy was delivered to Allegheny, Allegheny signed the Declarations page and paid premiums. As such, North River's countersigning of the Declarations page, in Illinois, New Jersey, or elsewhere, was not the last act necessary to create a binding insurance policy. For all of the reasons above, we discern no error in the circuit court's grant of Allegheny's motion for partial summary judgment, finding that Pennsylvania law applies to interpretation of the Non–JU Policies.

## II.

Appellant contends that it "is entitled to a set-off against any liability it may have for the underlying lawsuits under the [Non–JU] Policies reflecting the shares of liability" for lawsuits that were settled by Allegheny. Appellant contends that under Pennsylvania law, non-settling insurers are entitled to a "set off or credit" of loss for amounts covered by settling policies. Appellant points out that Allegheny represented to the circuit court that it had reached settlements with numerous insurers that issued the general and specific policies. Relying on *Koppers Co. Inc. v. Aetna Cas. & Sur. Co.*, 98 F.3d 1440 (3rd Cir.1996), appellant argues that the Third Circuit predicted "where the case involved excess insurers and insurer settlements, the Pennsylvania Supreme Court would hold

the excess insurer jointly and severally liable for the amount of the loss only in excess of the settling insurers' *pro rata* shares of liability."

Allegheny responds that appellant has waived the right to challenge the circuit court's failure to declare it entitled to a set-off because the issue was raised only as a secondary issue in appellant's motion for partial summary judgment, and later abandoned by appellant. Allegheny asserts that appellant abandoned the set-off issue in the circuit court when the primary issue—whether there existed a viable breach of contract claim by Allegheny against appellant—was resolved in appellant's favor. Allegheny maintains that, by not submitting additional filings to the circuit court regarding the set-off issue after the circuit court deferred ruling on the issue at the May 11, 2010, hearing, appellant waived the set-off claim.

Alternatively, Allegheny contends that the circuit court did not abuse its discretion in failing to find that appellant was entitled to a set-off, as any set-off right would be "wholly theoretical." Allegheny argues that the circuit court did not abuse its discretion in deferring adjudication of "an unnecessary, wholly theoretical issue in circumstances where all the parties' rights are in no way prejudiced." Allegheny asserts that proper analysis of the set-off "require[s] facts not yet known," including "what the non-settling insurer [appellant] owes" and "what other jointly responsible primary and excess insurers owe and have paid, including those who have settled."

In a reply brief, appellant contends that Allegheny put the matter of a set-off at issue by requesting a declaration that appellant and other insurers were required to pay for damages stemming from asbestos suits, and that it (appellant) properly raised the issue of a set-off in the motion for partial summary judgment. Appellant points out that the circuit court held *sub curia* or deferred ruling on the set-off. Appellant maintains that, in its ruling of January 10, 2011, the circuit court "recognized that set[-]off was still at issue at the trial when it held that it would extend its prior set[-]off and allocation rulings to the Non–JU Policies." As to the merits,

appellant argues that if the circuit court appropriately granted declaratory judgment to Allegheny, finding that it was entitled "to coverage for 'all sums' under the Non–JU Policies, even though it admits that [appellant] 'may never owe any coverage,' then surely [appellant] was entitled to a declaration that it [has the right to] a set-off for those same future liabilities."

In *Dashiell v. Meeks,* 396 Md. 149, 165, 913 A.2d 10 (2006), the Court of Appeals explained that an appellate court reviews for abuse of discretion a denial of a motion for summary judgment. The Court stated:

> [A] trial court may even exercise its discretionary power to deny a motion for summary judgment when the moving party has met the technical requirements of summary judgment. Thus, on appeal, the standard of review for a denial of a motion for summary judgment is whether the trial [court] abused [its] discretion and in the absence of such a showing, the decision of the trial [court] will not be disturbed.

*Id.* (citations omitted).

No Pennsylvania appellate court has directly addressed the question of whether an insurer of an excess insurance policy is entitled to a set-off based on settlements reached between the insured and other insurers. In *Gould, Inc. v. Cont'l Cas. Co.,* 401 Pa.Super. 219, 585 A.2d 16, 19 (1991), the Superior Court of Pennsylvania held that, where an insured settled with one of several insurers liable under primary insurance policies for damages paid by the insured, "[t]he terms of the insurance policy will determine the amount of coverage that [the insurer] is obligated to pay." The Superior Court stated that, "[i]n the event that the policy contains an 'other insurance' or 'pro rata' clause, and the coverage for which [one insurer] is being held liable is covered by the insurance provided by [another insurer], [the first insurer] will be entitled to prorate the amount of coverage." *Id.* Such reduction in the first insurer's liability would prevent it from being required to pay coverage for which other insurers were liable. *Id.*

In *J.H. France Refractories Co. v. Allstate Ins. Co.*, 534 Pa. 29, 626 A.2d 502, 507–08 (1993), reversing the Superior Court of Pennsylvania's decision that the liability of six primary insurers for the insured's damages stemming from claims of asbestos-related disease could be reduced on a pro rata basis, the Supreme Court of Pennsylvania held that each insurer was jointly and severally liable for the full amount of the claim up to the policy limits. The Court based the decision on three relevant factors: (1) language in each policy that the insurers agreed to pay *"all sums* which the Insured shall become legally obligated to pay as damages because of bodily injury to which th[e] insurance applie[d,]" not merely a pro rata portion, *id.* at 507 (emphasis in original); (2) the non-linear nature of asbestos-related illness, which prevented allocation of liability based solely on the length of time an insurance policy was in effect, *id.* at 508; and (3) the continuing nature of the asbestos exposure that led to the claimants' injuries, which constituted a single "occurrence" that lasted over the course of all policy periods, *id.* The Court concluded that the insured was entitled to choose any triggered policy to indemnify it for damages up to the limits of that policy before seeking indemnification from another insurer. *Id.* at 508–09. The Court noted, however, that its "conclusion d[id] not alter the rules of contribution or the provisions of 'other insurance' clauses in the applicable policies[,]" clarifying that its decision created "no bar against an insurer obtaining a share of indemnification or defense costs from other insurers under 'other insurance' clauses or under the equitable doctrine of contribution." *Id.* at 509.

Relying on the decisions in *Gould* and *J.H. France*, in *Koppers Co. Inc., v. Aetna Cas. & Sur. Co.*, 98 F.3d 1440, 1452 (3rd Cir.1996), the United States Court of Appeals for the Third Circuit predicted that, if asked to consider the issue of insurers' liability under excess insurance policies where the insured had previously reached settlements with other insurers regarding related damages, Pennsylvania courts would "modify the *J.H. France* rule to hold the [insurers on excess insurance policies] jointly and severally liable for the amount

of the loss *in excess of* the settling insurers' pro rata shares of liability." (Emphasis in original).

The Court explained its reasoning for the modification as follows:

> We begin with the principle of indemnity, a fundamental principle of insurance law which prohibits insurance contracts from conferring a benefit greater than the insured's loss (i.e., a "double recovery"). We must apply this principle of indemnity—barring recoveries greater than losses—in conjunction with the *J.H. France* rule—holding that where multiple insurance policies are triggered to cover an indivisible loss, each insurer may be called upon to cover the entire loss up to policy limits. *J.H. France* does *not*, of course, hold that an insured, having recovered part of its loss from one insurer, can recover an amount equal to its entire loss from another.

*Id.* (internal citations omitted) (emphasis in original).

The Third Circuit noted that, in Pennsylvania, an excess insurance policy is not triggered until the limits of the underlying primary coverage have been reached, even if the primary insurer is insolvent and cannot pay the full amount owed. *Id.* at 1454. It extrapolated that, where a solvent primary insurer settles with the insured, "settlement with the primary insurer functionally 'exhausts' primary coverage and therefore triggers the excess policy—though by settling the policyholder loses any right to coverage of the difference between the settlement amount and the primary policy's limits." *Id.* Once the excess insurance policy is triggered, the Third Circuit concluded that, pursuant to *J.H. France*, the insured is indemnified by the excess policies first, and then the insurers may determine the liability of each among themselves. *Id.* The Third Circuit concluded that:

> the non-settling excess insurers are jointly and severally liable for the full amount of the loss in excess of: the sum of (1) the policy limits of the directly underlying, "exhausted" primary policies, and (2) the combined pro rata shares of other settling (primary and excess) insurers. The benefi-

cent consequences of this formula are that the insured bears the risk of settling too low while the non-settling insurers bear the risk of being unable to redistribute equitably among themselves the burden of paying the balance (if, for example, some of their number are insolvent).

*Id.* at 1455.

The Third Circuit held that it could not, based on the record before it, determine the set-off due to the insurer on the excess policy at issue, explaining as follows:

Determining the apportioned share of a settling insurer requires consideration of the "other insurance" clauses of the policies found to cover the loss and the applicable state law governing the interpretation of those clauses and the resolution of any conflicts among them. The record before us does not contain the "other insurance" clauses from all potentially applicable policies.... In these circumstances, we cannot determine what the apportioned shares of the settling insurers will be.

*Id.* (footnote and internal citations omitted). The Third Circuit provided two observations to assist the District Court in calculating the appropriate set-off. The Third Circuit noted first that "the district court may be required to deduct from the total loss the combined limits of all settled primary policies." *Id.* at 1456 (emphasis added). The Third Circuit observed that as "[t]he 'other insurance' clauses of the relevant policies and the Pennsylvania law applicable thereto may require that, as between a primary policy and an excess policy triggered to cover the same loss, the primary policy must pay first and, accordingly, that the apportioned share of a settled primary policy covering the same indivisible loss is its full policy limits." *Id.* (citation omitted). Secondly, the Third Circuit advised that "[i]t may be that, under the applicable law, the apportioned *share* of a settling excess insurer ... cannot be determined without identifying all policies that are triggered and cover the indivisible loss[.]" *Id.* (emphasis in original).

■■■■ Applying the principles set forth above, we discern no abuse of discretion in the circuit court's January 10, 2011, denial of appellant's motion for partial summary judgment as to the issue of set-off.[8] In Pennsylvania, where multiple primary and excess insurance policies indemnify an insured for a single occurrence, a non-settling excess insurance policy is triggered only upon exhaustion of its directly underlying policies, either by settlement or payment. *Koppers*, 98 F.3d at 1455; *J.H. France*, 626 A.2d at 508. After the excess insurance policy is triggered and the insured indemnified, the insurers may determine liability among themselves. *J.H. France*, 626 A.2d at 509. As the Third Circuit observed in *Koppers*, 98 F.3d at 1455, determining the apportioned share of liability, *i.e.*, a set-off, requires examining the policies at issue and the state law governing the policies. In *Koppers, id.* at 1456, the Third Circuit noted that the trial court may be required to deduct from the total loss of the combined limits of all settling claims.

In this case, in requesting a declaration that it is entitled to a set-off, appellant, in essence, requested that the circuit court determine it is entitled to a set-off without knowing whether it (appellant) would be found liable for any coverage, without knowing the amount it might be liable for, and without information concerning the settling insurers' policies and the details of their liability. It is undisputed that no claims have been made against Allegheny that trigger the AEGIS policy (with the potential to trigger the Non–JU Policies). To apply the Third Circuit's prediction regarding Pennsylvania law in *Koppers*, the circuit court would need to be aware of the

---

**8.** Although Allegheny contends that appellant failed to preserve the issue, we shall, nonetheless, address the merits of the matter. Appellant raised the issue in its motion for partial summary judgment. Although in deferring ruling on the issue, on June 1, 2010, the circuit court invited appellant to file additional memoranda on the issue of set-off, and it may have been in appellant's best interest to have heeded the circuit court's request, appellant did not forfeit the right to raise the issue on appeal by not filing additional information. The motion was decided by the circuit court on January 10, 2011, and appellant properly appealed the circuit court's January 10, 2011, order.

amount owed by appellant and the settling insurers' apportioned share of liability, *i.e.,* the pro rata shares of the settling insurers. It is presently not possible to determine the pro rata shares of all settling insurers because there is no way of knowing how many settling insurers there will be when the Non–JU Policy is triggered or the total liability for which the settling insurers will be responsible. As such, a declaration that appellant is entitled to a set-off is not possible for a myriad of reasons.

Appellant's contention that calculation of the pro rata shares of settling insurers is no more speculative than a declaration that the Non–JU Policies may be triggered by claims of asbestos-related illness is unpersuasive. The circuit court's determination regarding triggering of claims under the Non–JU Policies was based solely on the language of the policies. In interpreting the language of the Non–JU Policies, the circuit court determined that asbestos-related illness is a type of bodily injury covered by the Non–JU Policies, and tailored the finding to apply to only "asbestos suits [that] seek to hold Allegheny liable for an alleged failure to maintain a safe workplace and/or failure to warn of alleged asbestos risks at the workplaces[.]" Thus, the circuit court identified a category of cases to which the Non–JU Policies apply. In so doing, the circuit court was not required to know the facts or circumstances of the cases to be brought in the future. The declaration as to a set-off requested by appellant, on the other hand, would require the circuit court to make determinations based on events which have not yet occurred. Under the circumstances, we have no difficulty in concluding that the circuit court did not abuse its discretion in denying appellant's motion for partial summary judgment as to the issue of set-off.

**JUDGMENTS OF THE CIRCUIT COURT FOR WASHINGTON COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANT.**